[L.A. No. 32012. Aug. 1, 1985.]

WARREN BLANK, Plaintiff and Appellant, v.
KEVIN KIRWAN et al., Defendants and Respondents.

**COUNSEL**

Julius Grush and John D. Wilson for Plaintiff and Appellant.

Rosenberg, Nagler & Weisman, Weisman, Butler & Watson, Mark L. Weisman, Marylin Jenkins White, Dana E. Watson, Wildman, Harrold, Allen, Dixon, Barash & Hill, Barash & Hill, Jerry M. Hill, Christina L. Machon, J. Robert Flandrick, City Attorney, Burke, Williams & Sorensen, Virginia R. Pesola and Geoffrey V. Morson for Defendants and Respondents.

**OPINION**

**MOSK, J.**—We must decide whether efforts to influence municipal action that are intended to and actually do produce anticompetitive effects are violative of the Cartwright Act when both private individuals and public officials participate. We conclude the act does not apply and hence the judgment must be affirmed.

I

The factual background and procedural history of this action are somewhat complicated. On June 29, 1978, the city council of defendant City of Bell enacted Ordinance No. 806, which legalized the operation of poker clubs in the city and established a structure of regulation. In August 1978 the city council adopted zoning ordinances adding a new zone classification for commercial and manufacturing uses (the C-M zone) to the city's zoning regulations and reclassifying to the C-M zone a certain 20-acre parcel controlled by defendants Crow, Crow Los Angeles No. 8, and Trammell Crow

Co. (hereafter the Crow defendants).[1] Poker clubs were designated as one of a number of permitted uses in the C-M zone. The voters of the city subsequently approved the zoning ordinances.

In the fall of 1978 plaintiff and defendant California Bell Operations (a limited partnership whose general partners were defendants Kirwan, Gasparian, and Simonian) each applied for a poker club license. In December 1978 the city council approved the application of California Bell Operations. At plaintiff's request the city council put off its consideration of his application because he had not obtained, as Ordinance No. 806 required, a lot of at least 7.5 acres properly zoned. California Bell Operations had previously obtained such a lot in the 20-acre parcel.

On July 17, 1979, plaintiff filed his original complaint in this action. In May 1980 the city council formally denied plaintiff's application. In October 1980 plaintiff filed his first amended complaint, in which he alleged six causes of action: (1) violation of his civil rights, against all named defendants and all doe defendants including public officials of the City of Bell; (2) unfair competition (Bus. & Prof. Code, § 16700 et seq.), against all defendants except the City of Bell; (3) unfair competition (id., § 16600), against Crow Los Angeles No. 8 and Kirwan; (4) unfair competition (id., § 17200), against all defendants except the City of Bell; (5) intentional interference with prospective economic advantage, against all defendants except the City of Bell; and (6) declaratory relief. In July 1982 plaintiff amended his first amended complaint to name defendant Werrlein, a former member of the city council, as one of the doe public-official defendants.

In December 1980 Kirwan and the Crow defendants demurred to the first amended complaint. In October 1982 Kirwan moved for dismissal for failure to prosecute pursuant to former Code of Civil Procedure section 583, subdivision (a); the City of Bell, Werrlein, and the Crow defendants subsequently joined in this motion. Also in October 1982 the City of Bell and Werrlein demurred, and California Bell Operations, Gasparian, and Simonian moved for dismissal for failure to prosecute pursuant to former Code of Civil Procedure section 581a, subdivision (a).[2]

On December 9, 1982, the trial court sustained the demurrers without leave to amend and granted motions to dismiss. From the ensuing judgment of dismissal plaintiff appeals.

---

[1]It is not clear from the record which of the Crow defendants actually owned the 20-acre parcel. For purposes of this action, however, the question is immaterial.

[2]Plaintiff did not oppose the motion to dismiss pursuant to former Code of Civil Procedure section 581a, subdivision (a), insofar as it related to Gasparian and Simonian.

## II

Plaintiff contends the trial court erred in sustaining the demurrers without leave to amend.

■ In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42 [172 P.2d 867].) When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. (See *Hill* v. *Miller* (1966) 64 Cal.2d 757, 759 [51 Cal.Rptr. 689, 415 P.2d 33].) And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. (*Kilgore* v. *Younger* (1982) 30 Cal.3d 770, 781 [180 Cal.Rptr. 657, 640 P.2d 793]; *Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406].) The burden of proving such reasonable possibility is squarely on the plaintiff. (*Cooper* v. *Leslie Salt Co., supra,* at p. 636.)

In his first amended complaint, plaintiff alleges in essence as follows. Defendants—who include private individuals and city officials—conspired to legalize and monopolize the operation of poker clubs in the City of Bell, acting on the "inside information" that the city was considering adopting ordinances legalizing poker clubs and restricting them to a certain part of the city. Defendants agreed to attempt to secure government action under which (1) poker clubs would be legalized, (2) such clubs would be allowed only in a to-be-created C-M zone, and (3) only the 20-acre parcel would be so zoned; they also agreed that only California Bell Operations would be permitted to obtain the requisite 7.5-acre lot in such parcel. Accordingly, Kirwan obtained from Trammell Crow Co. an option to lease eight acres of the twenty-acre parcel and an option to purchase an additional five acres. The so-called conspiracy was successful. For their participation California Bell Operations and its general partners Kirwan, Gasparian, and Simonian received a monopoly; the Crow defendants received help from the city-official defendants in securing from the city certain permits, approvals, and other action favorable to their interests; and the city-official defendants received from the private defendants "rewards, things of value, and other valuable consideration."

In the second amended complaint he proposes to file, plaintiff—except as otherwise noted in the following discussion—makes essentially the same allegations but with greater specificity.

As will appear, the first amended complaint does not state facts sufficient to constitute a cause of action, and plaintiff does not carry his burden of proving a reasonable possibility that the defects can be cured by amendment.

## A

Plaintiff originally contended that by alleging a successful conspiracy to legalize and monopolize poker clubs in his first cause of action, he stated facts sufficient to make out causes of action under section 1983 of title 42 of the United States Code for due process and equal protection violations and a cause of action under section 1985(3) of the same title for an equal protection violation.

■ To state a due process cause of action under section 1983, a party must, as a threshold matter, allege a liberty or property interest within the protection of the Fourteenth Amendment. (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 570-572 [33 L.Ed.2d 548, 556-558, 92 S.Ct. 2701].) A property interest is defined as "a legitimate claim of entitlement to [a benefit]." (*Id.,* at p. 577 [33 L.Ed.2d at p. 561].) Thus, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it." (*Ibid.*)

The defendants sought dismissal of this claim on the ground, among others, that plaintiff had no property interest in the award of the license. The court agreed and granted the motion.

In this court plaintiff abandoned his due process claim. In effect he conceded that although he may have an "abstract need" or "desire" for or a "unilateral expectation" of a poker club license, he is unable to show that he has any "legitimate claim of entitlement" to it.

■ To state an equal protection cause of action under section 1983 a party "must set forth facts showing some intentional and purposeful deprivation of constitutional rights." (*Powell* v. *Workmen's Compensation Bd. of State of New York* (2d Cir. 1964) 327 F.2d 131, 137; accord, e.g., *Jones* v. *Community Redevelopment Agency* (9th Cir. 1984) 733 F.2d 646, 649-650.) Plaintiff now concedes he cannot set forth any such facts: the conspiracy as alleged sought to enrich the coconspirators, not to deprive plaintiff of any of his constitutional rights.

■ Finally, to state a cause of action under section 1985(3), a party must allege, inter alia, "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." (*Griffin v. Breckenridge* (1971) 403 U.S. 88, 102 [29 L.Ed.2d 338, 348, 91 S.Ct. 1790].) No such animus is stated in the allegations of the first amended complaint or in those of the proposed second amended complaint. Plaintiff recognizes this fact and has now abandoned his section 1985(3) cause of action.

### B

■ Plaintiff still contends the trial court erred in sustaining the demurrers to the second cause of action without leave to amend. Specifically, he argues that the first amended complaint states facts sufficient to constitute a cause of action under the Cartwright Act, and that even if it does not, the second amended complaint he proposes to file would do so. The claim is unpersuasive.

The Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) generally declares that "every trust is unlawful, against public policy and void." (*Id.,* § 16726.) For purposes of the act, the term "trust" includes any "combination of capital, skill or acts by two or more persons . . . [t]o create or carry out restrictions in trade or commerce." (*Id.,* § 16720, subd. (a).) ■ In interpreting the Cartwright Act, we properly look to the Sherman Act and cases construing it: "the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law." (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833].) As we conclude and all parties agree, the cases relevant here are those that have articulated and construed what is commonly referred to as the *Noerr-Pennington* doctrine or immunity.

■ Stated most generally, the *Noerr-Pennington* doctrine declares that efforts to influence government action are not within the scope of the Sherman Act, regardless of anticompetitive purpose or effect. (*Eastern R. Conf.* v. *Noerr Motors* (1961) 365 U.S. 127, 135-144 [5 L.Ed.2d 464, 469-475, 81 S.Ct. 523] [legislative and executive branches]; *Mine Workers* v. *Pennington* (1965) 381 U.S. 657, 669-672 [14 L.Ed.2d 626, 635-637, 85 S.Ct. 1585] [executive branch]; *California Transport* v. *Trucking Unlimited* (1972) 404 U.S. 508, 509-511 [30 L.Ed.2d 642, 645-646, 92 S.Ct. 609] [judicial branch and administrative agencies].)

The doctrine "rests on statutory interpretation . . . ." (*In re Airport Car Rental Antitrust Litigation* (N.D.Cal. 1981) 521 F.Supp. 568, 575; see *Noerr,* 365 U.S. at pp. 135-137 [5 L.Ed.2d at pp. 469-471]; *Pennington,*

381 U.S. at p. 669 [14 L.Ed.2d at p. 635]; see generally Handler & De Sevo, *The Noerr Doctrine and Its Sham Exception* (1984) 6 Cardozo L.Rev. 1, 3-5, 25, 36 [hereafter Handler & De Sevo].) In other words, the doctrine states that efforts to influence government action "do[] not fall within the scope of the Sherman Act in the first place, not that [they are] removed from the act by an exemption." (*In re Airport Car Rental Antitrust Litigation, supra,* at p. 575; accord, Handler & De Sevo, *supra,* at pp. 3-5, 25.)

Although resting on statutory interpretation the *Noerr-Pennington* doctrine is reinforced by two constitutional considerations: the First Amendment right to petition the government (*California Transport,* 404 U.S. at pp. 510-511 [30 L.Ed.2d at pp. 646-647]; *Noerr,* 365 U.S. at pp. 137-138 [5 L.Ed.2d at pp. 470-471]; see generally Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine* (1977) 45 U.Chi.L.Rev. 80 [hereafter Fischel]) and comity, i.e., noninterference on the part of the courts with governmental bodies that may validly cause otherwise anticompetitive effects and with efforts intended to influence such bodies (*Noerr, supra,* at pp. 137, 139 [5 L.Ed.2d at pp. 470, 472]; *Metro Cable Co.* v. *CATV of Rockford, Inc.* (7th Cir. 1975) 516 F.2d 220, 224, 227; Note, *The Noerr-Pennington Doctrine and the Petitioning of Foreign Governments* (1984) 84 Colum.L.Rev. 1343, 1344, fn. 10 [hereafter *Noerr-Pennington Abroad*]; see generally 1 Areeda & Turner, Antitrust Law (1978) ¶ 204d, pp. 49-50 [hereafter 1 Areeda & Turner]). (*Affiliated Capital Corp.* v. *City of Houston* (S.D.Tex. 1981) 519 F.Supp. 991, 1024; *Wilmorite, Inc.* v. *Eagan Real Estate, Inc.* (N.D.N.Y. 1977) 454 F.Supp. 1124, 1136, affd. (2d Cir. 1978) 578 F.2d 1372, cert. den., 439 U.S. 983 [58 L.Ed.2d 655, 99 S.Ct. 573].)[3]

It is only when efforts to influence government action are a "sham" that they fall outside the protection of the *Noerr-Pennington* doctrine and within the scope of the Sherman Act. (*California Transport,* 404 U.S. at pp. 511-516 [30 L.Ed.2d at pp. 646-649]; *Noerr,* 365 U.S. at p. 144 [5 L.Ed.2d at p. 475]; see generally Areeda, Antitrust Law (1982 supp.) [¶] 202, pp. 4-5 [hereafter Areeda, Antitrust Supplement].) Such efforts amount to a sham

---

[3]The courts (see, e.g., *In re Airport Car Rental Antitrust Litigation* (N.D.Cal. 1979) 474 F.Supp. 1072, 1083-1084) and commentators (see, e.g., Fischel, *supra,* 45 U.Chi.L.Rev. at pp. 87-88) that conclude or suggest that the *Noerr-Pennington* doctrine results from constitutional adjudication rather than statutory interpretation seem misled by *California Transport.* In considering the applicability of the *Noerr-Pennington* doctrine to the judicial sphere, *California Transport* bypasses discussion of statutory interpretation to deal immediately with constitutional considerations (404 U.S. at pp. 510-511 [30 L.Ed.2d at pp. 646-647]), perhaps because the legislative history of the Sherman Act does not as plainly support the applicability of the doctrine to that sphere as it does to the other spheres (see *Noerr-Pennington Abroad, supra,* 84 Colum.L.Rev. at pp. 1351-1352 [the act was intended to protect "politics . . . and not . . . appeals to nonpolitical government bodies such as courts."]).

when though "ostensibly directed toward influencing governmental action, . . . [they are] actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . ." (*Noerr, supra,* at p. 144 [5 L.Ed.2d at p. 475].) Such efforts, by contrast, do not amount to a sham when, no matter how anticompetitive in purpose or effect, they constitute a "genuine effort to influence [government action] . . . ." (*Ibid.*) In other words, efforts to influence government action are a sham only when the person or persons making such efforts "invok[es] the process of [governmental] decisionmaking for the injury that *the process alone* will work on competitors . . . ." (*Litton Systems, Inc.* v. *American Tel. & Tel. Co.* (2d Cir. 1983) 700 F.2d 785, 810, italics added; accord, Handler & De Sevo, *supra,* 6 Cardozo L.Rev. at pp. 7-14.)

■ With these considerations in mind, we turn to the case before us. In the first amended complaint, plaintiff alleges in essence that the private-individual and the public-official defendants successfully conspired to legalize and monopolize the operation of poker clubs in the City of Bell through government action. Such allegations, however, do not state facts sufficient to constitute a cause of action under the Cartwright Act.

First, defendants' efforts, according to the very allegations of the pleading, were directed at influencing government action and as such are squarely within the protection of the *Noerr-Pennington* doctrine. "Construing the allegations of [plaintiff's] complaint liberally, it asserts nothing more than that [defendants] sought to obtain a monopoly from City. This is precisely the type of conduct that *Noerr-Pennington* protects." (*Hopkinsville Cable TV* v. *Pennyroyal Cablevision, Inc.* (W.D.Ky. 1982) 562 F.Supp. 543, 546.)[4]

Second, government action, again according to the very allegations of the pleading, is the legal cause of whatever injury plaintiff may have suffered. The legal cause of plaintiff's alleged injury is the city council's legalization of poker clubs and its subsequent denial of plaintiff's application—not, as he sometimes argues, the alleged real estate transactions between Kirwan and the Crow defendants. These transactions may have facilitated some aspects of the conspiracy, but that is all: they are not alleged to, nor could they, prevent plaintiff or any other applicant from obtaining a lot of requisite size outside the C-M zone and having it rezoned to allow a poker club. According to his own admission, plaintiff evidently declined to make the

[4]Plaintiff seems to rely on *Woods Exploration & Pro. Co.* v. *Aluminum Co. of Amer.* (5th Cir. 1971) 438 F.2d 1286, for the proposition that the *Noerr-Pennington* doctrine is inapplicable to the licensing process. Whether or not *Woods* in fact supports such a proposition is irrelevant since *California Transport* is to the contrary (404 U.S. at pp. 509-511 [30 L.Ed.2d at pp. 645-646]).

attempt on the ground it would have been futile: "the application process was a sham and a fraud, because, among other things . . . [¶] [t]he defendants knew and intended and concealed that defendant California Bell Operations, Ltd. would be the only applicant to receive a permit, and that all other applications would be denied." Thus, the real estate transactions do not constitute a necessary cause of his alleged injury. Nor, as a matter of law, do they constitute a sufficient cause: there could have been no injury absent the city council's enactment of the poker club and zoning ordinances and its denial of plaintiff's application. Because government action is the legal cause of whatever injury plaintiff may have suffered, defendants cannot be liable. (*In re Airport Car Rental Antitrust Litigation, supra,* 521 F.Supp. at p. 574; Handler & De Sevo, *supra,* 6 Cardozo L.Rev. at p. 46 [Sherman Act].)

Third, the government action alleged here cannot violate the Cartwright Act. The actions of political subdivisions of the state, such as the City of Bell, and the effects of such actions are outside the scope of the act. (*People* ex rel. *Freitas* v. *City and County of San Francisco* (1979) 92 Cal.App.3d 913, 920-921 [155 Cal.Rptr. 319]; *Widdows* v. *Koch* (1968) 263 Cal.App.2d 228, 235 [69 Cal.Rptr. 464]; Folsom & Fellmeth, Cal. Antitrust Law and Practice (1983) § 6 at pp. 5-6; see Bus. & Prof. Code, § 16702.) Because the government action alleged here and its effects are not within the scope of the act, under the *Noerr-Pennington* doctrine neither are efforts made to influence such action and to cause such effects. (*Metro Cable Co.* v. *CATV of Rockford, Inc., supra,* 516 F.2d at p. 229 [Sherman Act].) To hold individual defendants liable under the Cartwright Act for influencing government action that is itself outside the scope of the act is untenable. (See *People* ex rel. *Freitas* v. *City and County of San Francisco, supra,* at pp. 925-926.)

■ To avoid this conclusion, plaintiff contends that he has alleged city officials were coconspirators and that consequently the *Noerr-Pennington* doctrine does not apply.

First, the authority he cites is of dubious value, comprising dicta in *California Transport* (404 U.S. at p. 513 [30 L.Ed.2d at p. 647]) and *Independent Taxicab Operators' Ass'n.* v. *Yellow Cab Co.* (N.D.Cal. 1968) 278 F.Supp. 979, 985. The latter is of little weight because it relies on *Harman* v. *Valley National Bank of Arizona* (9th Cir. 1964) 339 F.2d 564, which the subsequently decided *Noerr* and *Pennington* cases have undermined (*Sun Valley Disposal Co.* v. *Silver State Disposal Co.* (9th Cir. 1969) 420 F.2d 341, 342).

Second and more important, the fact that a public official has participated in efforts to influence government action is generally immaterial. (See, e.g.,

*Metro Cable Co.* v. *CATV of Rockford, Inc., supra,* 516 F.2d at p. 230; *Cow Palace, Ltd.* v. *Associated Milk Producers, Inc.* (D.Colo. 1975) 390 F.Supp. 696, 704-705; Fischel, *supra,* 45 U.Chi.L.Rev. at p. 115; Note, *Application of the Sherman Act to Attempts to Influence Government Action* (1968) 81 Harv. L.Rev. 847, 856-857; see also *First Am. Title Co. of S.D.* v. *S.D. Land Title Ass'n* (8th Cir. 1983) 714 F.2d 1439, 1446 [recognizing that the so-called "official coconspirator" exception has been criticized and refusing to rely on it].)

The immateriality of participation by a public official is supported by the First Amendment considerations involved in the *Noerr-Pennington* doctrine. In *Metro Cable Co.* v. *CATV of Rockford, Inc.,* the plaintiff made substantially the same argument as plaintiff offers here: it alleged that the defendant city officials were coconspirators on the ground that they had been persuaded by other defendants to support their application for a cable television franchise and to oppose the plaintiff's application, and that they had been given campaign contributions in exchange for their undertaking. In rejecting this contention the court reasoned as follows: "These allegations do not take the case outside the protection of the *Noerr* doctrine. Plaintiff's position is in essence that an agreement to attempt to induce legislative action is a 'conspiracy,' and that if some of the 'conspirators' persuade a member of the legislative body to agree to support their cause, he becomes a 'co-conspirator' and a Sherman Act violation results. Such a rule would in practice abrogate the *Noerr* doctrine. It would be unlikely that any effort to influence legislative action could succeed unless one or more members of the legislative body became such 'co-conspirators.' A holding that participation by members of the legislative body to the extent alleged here rendered the *Noerr* doctrine inapplicable to a campaign to induce legislative action, would . . .' . . . be tantamount to outlawing all such campaigns.'" (516 F.2d at p. 230.)

The immateriality of participation by a public official is supported as well by the comity considerations involved in the *Noerr-Pennington* doctrine. When as in this case the anticompetitive effect alleged is caused by government action that is itself outside the scope of the antitrust laws, it would be untenable to hold that the participation of a public official renders the efforts to influence such government action violative of the law. Such a result follows, of course, when the official's motivation is altogether proper. But it also follows when it is not—at least in cases such as this in which the official is a member of a nonjudicial body. "[T]he constitutional doctrine of separation of powers precludes judicial inquiry into the 'motivation or mental processes' which may underlie action by a nonjudicial agency of government." (*In re Fain* (1976) 65 Cal.App.3d 376, 393, fn. 14 [135 Cal.Rptr. 543]; see, e.g., *Fletcher* v. *Peck* (1810) 10 U.S. (6 Cranch) 87,

130 [3 L.Ed. 162]; *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 723, 727, fn. 5 [119 Cal.Rptr. 631, 532 P.2d 495].) Thus, the official's motives, no matter how self-interested they may be, cannot vitiate otherwise valid government action. (See, e.g., *Fletcher* v. *Peck, supra,* at p. 130; *County of Los Angeles* v. *Superior Court, supra,* at pp. 723, 727, fn. 5; *In re Fain, supra,* at p. 393, fn. 14.)

In a final attempt to show that the first amended complaint states facts sufficient to constitute a cause of action under the Cartwright Act, plaintiff asserts the case falls within the "sham" exception. It clearly does not. Defendants' actions as alleged amounted to a "genuine effort to influence [government action] . . . ." (*Noerr*, 365 U.S. at p. 144 [5 L.Ed.2d at p. 475].) ■ Plaintiff urges in effect that because such actions were improper they were not "genuine." For the purposes of the *Noerr-Pennington* doctrine, however, impropriety and genuineness are not related. (See, e.g., *Bustop Shelters* v. *Convenience & Safety Corp.* (S.D.N.Y. 1981) 521 F.Supp. 989, 995 [although "the attempt to influence governmental officials in the instant case . . . may have been improper," it was "no sham . . . but . . . clearly an example of a 'genuine effort to influence' official action"]; Handler & De Sevo, *supra,* 6 Cardozo L.Rev. at p. 8.) Indeed, not only were defendants' efforts genuine, they were also successful—and as such incapable of being deemed a mere sham. (*Gorman Towers, Inc.* v. *Bogoslavsky* (8th Cir. 1980) 626 F.2d 607, 615; 1 Areeda & Turner, *supra,* [¶] 203c, p. 44; Handler & De Sevo, *supra,* at pp. 30-31.)

In his proposed second amended complaint, plaintiff claims, there would be allegations to the effect that the city-official defendants initiated and directed the efforts to legalize and monopolize the operation of poker clubs in the City of Bell, and that they sought and received bribes for their undertaking. Plaintiff argues in essence that the addition of such allegations would take the case outside the scope of the *Noerr-Pennington* doctrine. The First Amendment considerations reflected in the doctrine, he contends, are not implicated under such circumstances: to begin with, the efforts to influence government action were not initiated and directed, as in the typical *Noerr-Pennington* situation, by private individuals exercising their right to petition, but rather by public officials acting corruptly; next, the tactics used were not, as in the typical *Noerr-Pennington* situation, entitled to First Amendment protection, but rather are punishable under the criminal law. Because, he concludes, First Amendment considerations are therefore not implicated, the *Noerr-Pennington* doctrine is not applicable. Plaintiff's argument is unconvincing.

■ Even assuming that plaintiff is correct in asserting that First Amendment considerations are not implicated, we must nevertheless con-

clude that the *Noerr-Pennington* doctrine is applicable or, in other words, that whatever anticompetitive effects plaintiff might be able to prove are plainly not within the scope of the Cartwright Act. The reason is simple: although First Amendment considerations may not be implicated, comity considerations are. The government action alleged here—which is the legal cause of any anticompetitive effects—is the action of a political subdivision of the state and as such is outside the scope of the Cartwright Act. Plaintiff has not attacked the validity of such action directly, and may not attack it indirectly by alleging the corruption of some or all of the public officials involved (see, e.g., *Fletcher* v. *Peck, supra,* 10 U.S. (6 Cranch) at p. 130; *County of Los Angeles* v. *Superior Court, supra,* 13 Cal.3d at pp. 723, 727, fn. 5; *In re Fain, supra,* 65 Cal.App.3d at p. 393, fn. 14). Thus, because the government action alleged here and whatever anticompetitive effects it may have had are not within the scope of the Cartwright Act, neither are the efforts to influence such action and to cause such effects.

Our conclusion is not affected by the identity of the persons initiating or directing such efforts. In *Affiliated Capital Corp.* v. *City of Houston,* on which plaintiff relies, the federal district court held that an "official coconspirator" exception exists and that a public official's initiation and direction of efforts to influence government action for his own benefit satisfies the requirements of such an exception. (519 F.Supp. at pp. 1012-1023.) We cannot follow that trial court's lead. First, as we have concluded, no generally applicable "official coconspirator" exception exists. Second, the government action involved in *Affiliated Capital Corp.* fell within the scope of the antitrust laws; the governmental action alleged here does not. Whatever sense it might make to deny *Noerr-Pennington* protection to a conspiracy including public officials when it seeks government action itself violative of the antitrust laws, it is not rational to deny it to such a conspiracy when it seeks government action *not* violative of the antitrust laws. Third, official initiation and direction of a conspiracy may be material to the applicability of the *Noerr-Pennington* doctrine when, as in *Affiliated Capital Corp.,* only First Amendment considerations are present—for example, such initiation and direction may show that the conduct involved cannot properly be characterized as petitioning—but they seem clearly immaterial when as here comity considerations are present: when the government action sought falls outside the scope of the antitrust laws, the official capacity of the person who initiates and directs efforts to influence such action cannot trigger antitrust liability.

Nor is our conclusion affected by the character of the tactics used to influence government action. Although at times he concedes that the *Noerr-Pennington* doctrine is applicable to efforts that include illegal tactics, plaintiff generally argues that it is not. Relying, for example, on *Woods Explo-*

*ration and Pro. Co.* v. *Aluminum Co. of Amer., supra,* 438 F.2d 1286, he asserts that the First Amendment was not intended to protect such conduct. Whether plaintiff's contention is rational on this point is largely immaterial: the antitrust laws were plainly not intended to proscribe such conduct (*Noerr,* 365 U.S. at pp. 140-141, 145 [5 L.Ed.2d at pp. 472-473, 475]; see, e.g., Handler & De Sevo, *supra,* 6 Cardozo L.Rev. at p. 8 [Sherman Act]).

Thus, in *Cow Palace, Ltd.* v. *Associated Milk Producers, Inc.* (D.Colo. 1975) 390 F.Supp. 696, in granting the defendant's motion to dismiss for failure to state a claim the court held that the plaintiff's allegation that the defendant's efforts to influence government action included the making of illegal campaign contributions and the payment of bribes to federal officials did not take the case out of the *Noerr-Pennington* doctrine. Rejecting the plaintiff's argument—in substance the same as plaintiff's here—that the protection of the *Noerr-Pennington* doctrine is no broader than that of the First Amendment, the court reasoned: "In *Noerr,* the defendants had allegedly engaged in deliberate deception of 'the public and public officials.' The Court notes that such deception, 'reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned.' [Citation.] The Court does not explicitly tell us whether or not such 'reprehensible' conduct might be within the guarantees of the First Amendment. But resolution of that issue was unnecessary since the *conduct itself* was outside the intended scope of the Sherman Act." (*Id.* at p. 701, italics in original.)

Similarly, in *Schenley Industries, Inc.* v. *N.J. Wine & Spirit Whole. Ass'n* (D.N.J. 1967) 272 F.Supp. 872, the court struck portions of the complaint alleging lobbying as part of a conspiracy in violation of the Sherman Act. Rejecting Schenley's contention that illegal tactics could remove lobbying from the protection of the *Noerr-Pennington* doctrine, the court reasoned: "Since political activity to influence public officials is beyond the purview of the Act, it does not matter that independently illegal acts can be shown; separate civil or criminal actions might lie against the perpetrators, but the lobbying is not thereby transmuted into a violation of the Act. A private antitrust complaint is not the appropriate vehicle for state criminal laws whose enforcement is entrusted to state or local prosecutors. [Fn. omitted.]" (*Id.* at p. 885.)

Finally, plaintiff asserts that because he would allege that defendants' efforts included illegal conduct, he would satisfy the requirements of the sham exception and consequently state a cause of action under the Cartwright Act. But even if such efforts were altogether illegal, they were—as plaintiff impliedly admits—"genuine[ly intended] . . . to influence [government action] . . . ." (*Noerr,* 365 U.S. at p. 144 [5 L.Ed.2d at p. 475].)

Our conclusion that plaintiff has not stated a Cartwright Act cause of action does not, of course, imply that we take lightly, less still condone, unethical and illegal conduct, especially on the part of public officials. But as the United States Supreme Court said of the Sherman Act—and as we say here of the Cartwright Act—"Insofar as that Act sets up a code of ethics at all, it is a code that condemns *trade restraints* . . . ." (*Noerr,* 365 U.S. at p. 140 [5 L.Ed.2d at p. 473], italics added.) Because there is here no trade restraint violative of the Cartwright Act, we cannot hold defendants liable under the act no matter how reprehensible their conduct may be. Recognizing that "[t]he antitrust laws were never meant to be a panacea for all wrongs" (*Parmelee Transportation Company* v. *Keeshin* (7th Cir. 1961) 292 F.2d 794, 804, cert. den., 368 U.S. 944 [7 L.Ed.2d 340, 82 S.Ct. 376]), we therefore leave defendants to be sued or prosecuted under other laws—as, it appears, they have been.[5]

## C

Plaintiff contends that by alleging in his third cause of action that the purchase option and a lease arising from the lease option are contracts in restraint of trade, he has or could allege facts sufficient to constitute a cause of action for unfair competition under Business and Professions Code section 16600. The point is cursorily presented and, in any event, without merit.

Business and Professions Code section 16600 provides in relevant part that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." The provision generally proscribes contracts under which one or more of the parties agrees to restrict his activity in the marketplace in some way. (See, e.g., *Muggill* v. *Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 242-243 [42 Cal.Rptr. 107, 398 P.2d 147, 18 A.L.R.3d 1241] [covenant not to compete in employment agreement]; *Monogram Industries, Inc.* v. *Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 697-698 [134 Cal.Rptr. 714] [covenant not to compete in agreement on sale of stock in a corporation]; *Dayton Time Lock Service, Inc.* v. *Silent Watchman Corp.* (1975) 52 Cal.App.3d 1, 6-7 [124 Cal.Rptr. 678] [exclusive-dealing agreement].)

---

[5]As we judicially notice (Evid. Code, § 452, subd. (d)), Werrlein, Kirwan, and Simonian, among others, were indicted by a federal grand jury for mail fraud (18 U.S.C. § 1341), owning and conducting an illegal gambling business (*id.,* § 1955), interstate travel in aid of racketeering enterprises (*id.,* § 1952), aiding and abetting (*id.,* § 2), and racketeering (*id.,* §§ 1962 (a), 1963)—all arising from the alleged conspiracy to legalize and monopolize the operation of poker clubs in the City of Bell and related activities. To date, on guilty pleas Kirwan has been sentenced to six months in a community facility, and Werrlein has been sentenced to three years in prison, fined $21,000, and ordered to forfeit about $400,000 in profits he made from the poker club.

Plaintiff, however, does not allege or propose to allege that either the purchase option or the lease is or contains a contract under which any of the parties agrees to restrict his activity in the marketplace in any way; he merely asserts that these agreements affect *his* ability to compete. Accordingly, plaintiff does not and cannot state a cause of action under section 16600.

### D

Plaintiff makes a perfunctory contention that by alleging in his fourth cause of action a conspiracy to legalize and monopolize the operation of poker clubs, he has stated a cause of action for unfair competition under Business and Professions Code section 17200. He is unpersuasive.

"Unfair competition is defined to include 'unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising.' (Bus. & Prof. Code, § 17200.) . . . An 'unlawful business activity' includes ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " (*People* v. *McKale* (1979) 25 Cal.3d 626, 631-632 [159 Cal.Rptr. 811, 602 P.2d 731].)

Although "California courts have consistently interpreted such language broadly" (*id.* at p. 632), plaintiff has nevertheless failed to make or propose the requisite allegations. First, the conspiracy in the broad sense—defendants' efforts to influence government action toward the legalization and monopolization of poker clubs—cannot properly be called a business practice. But even if it could, plaintiff does not and cannot effectively state that it is forbidden by law: defendants' efforts, as we have concluded, cannot violate the Cartwright Act. Second, although the purchase option and the lease evidence what might be termed a business practice—specifically, a vertical relationship between Trammell Crow Co., the optionor and lessor, and Kirwan, the optionee and lessee—they are not, under plaintiff's allegations, forbidden by law. ■ A vertical relationship between the plaintiff's competitor and a third party does not support a cause of action for unfair competition as an illegal business practice absent, for example, allegations that the relationship is unlawful in itself or that it inflicts legal injury on consumers. (See *Plotkin* v. *Tanner's Vacuums* (1975) 53 Cal.App.3d 454, 459-460 [125 Cal.Rptr. 697].)

### E

■ Plaintiff contends that by alleging in his fifth cause of action that but for defendants' acts he would have made some undetermined profit operating a poker club in the City of Bell, he has stated or can state a cause

of action for intentional interference with prospective economic advantage. This point lacks merit.

 The elements of the tort of intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the acts of the defendant. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865].)

In neither the first amended complaint nor the proposed second amended complaint does plaintiff state such a cause of action, because the first element of the tort is lacking. Although plaintiff does not identify the other party to the "economic relationship," the result we reach is the same for each of the parties he suggests.

If, as seems the more reasonable reading, plaintiff is attempting to allege that the requisite economic relationship is with the city, he fails adequately to state the first element. First, "[t]he relationship between [plaintiff] and the City cannot be characterized as an economic relationship. It was [plaintiff's] relationship to a class of as yet unknown [patrons] which was the prospective business relationship." (*Asia Investment Co.* v. *Borowski* (1982) 133 Cal.App.3d 832, 841 [184 Cal.Rptr. 317, 30 A.L.R.4th 561].)

Second, even if the relationship between plaintiff and the city could be so characterized, it would make little difference. The tort has traditionally protected the expectancies involved in ordinary commercial dealings—not the "expectancies," whatever they may be, involved in the governmental licensing process. (See Prosser & Keeton, The Law of Torts (5th ed. 1984) § 130, p. 1006.) Plaintiff does not attempt to justify such an expansion of the tort. Nor would he likely have been successful if he had. Under Ordinance No. 806 the city council's discretion to grant or deny an application for a poker club license is so broad as to negate the existence of the requisite "expectancy" as a matter of law. Thus, "no facts are alleged . . . showing that the plaintiff had any reasonable expectation of economic advantage which would otherwise have accrued to him . . . ." (*Campbell* v. *Rayburn* (1954) 129 Cal.App.2d 232, 234 [276 P.2d 671].)

If, however, plaintiff is attempting to allege that the requisite economic relationship is with the class of potential poker club patrons, he still fails adequately to state the first element. In light of the city council's broad

discretion to grant or deny a license application, plaintiff has pleaded and can plead no protectible "expectancy," but at most a hope for an economic relationship and a desire for future benefit.

F

Plaintiff contends that he has stated or can state a cause of action for declaratory relief in his sixth cause of action.

Code of Civil Procedure section 1060 provides in relevant part: "Any person *interested* . . . under a contract . . . may . . . bring an original action . . . for a declaration of his rights and duties in the premises, including a determination of any question of construction or validity arising under such instrument or contract." (Italics added.) Plaintiff is not legally interested in the contracts as to which he seeks a declaration of validity—the lease option, the lease, and the purchase option between Trammell Crow Co. and Kirwan—nor does he argue that he is. Accordingly, he does not and cannot state a cause of action for declaratory relief.[6]

III

Plaintiff's next contention is that the trial court abused its discretion in granting the motion of Kirwan, Werrlein, City of Bell, and the Crow defendants to dismiss the action pursuant to former Code of Civil Procedure section 583, subdivision (a), for failure to prosecute.

Former section 583, subdivision (a), provided in relevant part: "The court, in its discretion, may dismiss an action for want of prosecution . . . if it is not brought to trial within two years after it is filed."[7] ▉ When the trial court has ruled on such a motion, "'unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.'" (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193]; accord, *Martindale* v. *Superior Court* (1970) 2 Cal.3d 568, 574 [86 Cal.Rptr. 71, 468 P.2d 199].) "'The burden is on the party complaining to establish an abuse of discretion . . . .'" (*Denham* v. *Superior Court, supra,* at p. 566.)

---

[6]*Siciliano* v. *Fireman's Fund Ins. Co.* (1976) 62 Cal.App.3d 745 [133 Cal.Rptr. 376]—the only case on which plaintiff relies—is plainly not to the contrary. There, as all parties recognized, the plaintiff *was* legally interested in the contract in question; indeed, he was a party to it.

[7]Former section 583 was repealed in 1984. (Stats. 1984, ch. 1705, § 4.) The substance of the sentence quoted above is continued in Code of Civil Procedure section 583.420, subdivision (a).

██ Plaintiff has not carried his burden, and we shall not disturb the court's order. From the date this action was filed until the date the trial court made its rulings—a period of almost three and one-half years—plaintiff did virtually nothing to prosecute this action. Indeed, the object of the little action he did take was to delay prosecution: plaintiff continually requested defendants to agree to continue hearings on their demurrers and finally obtained an agreement to take the demurrers off calendar indefinitely.

Plaintiff's reliance on *Meraia* v. *McCann* (1978) 83 Cal.App.3d 239 [147 Cal.Rptr. 756], is ill-founded. Although it contains some broad language (at p. 243) that appears to support plaintiff's position that an open-ended extension of time, such as the one obtained here, excuses a plaintiff from his obligation to prosecute during its term, *Meraia* properly read holds only that when and while a defendant obtains and enjoys an open-ended extension for his benefit and at his request, he may not complain that the plaintiff has not diligently prosecuted the action. Here defendants agreed to take their demurrer off calendar indefinitely for the benefit of plaintiff and at plaintiff's request.

Plaintiff makes two further contentions. First, he claims, defendants have not been prejudiced by his failure to prosecute. ██ But even if they have not, "[t]he legislative policy underlying section 583 is not grounded solely in prejudice caused by delay to a defendant. Its purpose, too, is to expedite the administration of justice by compelling every person who files an action to prosecute it with promptness and diligence." (*Sprajc* v. *Scandinavian Airlines System, Inc.* (1966) 240 Cal.App.2d 935, 938 [50 Cal.Rptr. 181]; accord, *Lopez* v. *Larson* (1979) 91 Cal.App.3d 383, 400 [153 Cal.Rptr. 912]; *Dunsmuir Masonic Temple* v. *Superior Court* (1970) 12 Cal.App.3d 17, 22-23 [90 Cal.Rptr. 405].) Second, plaintiff asserts, the factors listed in former California Rules of Court, rule 203.5 (current rule 373(e)), which the trial court was required to consider in ruling on defendants' motion, supported denial. But he cites nothing in the record to support such an assertion. Finally, plaintiff urges, the trial court was without jurisdiction to hear the motion because of certain alleged time defects in its notice. The point lacks merit. First, the alleged defects he cites are in the notice of a *different* motion. Second, the parties apparently agreed on dates for defendants to respond to the first amended complaint and for a hearing on such responses. Thus, plaintiff evidently waived whatever time defects may have existed.

IV

Plaintiff's final contention is that the trial court erred in granting the motion of California Bell Operations to dismiss pursuant to former Code of

Civil Procedure section 581a, subdivision (a). That section provided in relevant part, "No action . . . shall be further prosecuted, and no further proceedings shall be had therein, and all actions . . . shall be dismissed . . ., unless the summons on the complaint is served and return made within three years after the commencement of said action, except where . . . the party against whom the action is prosecuted has made a general appearance in the action."[8] The provision was mandatory and jurisdictional. (*Gonsalves v. Bank of America* (1940) 16 Cal.2d 169, 172 [105 P.2d 118].)

Conceding as he must that the provision is otherwise applicable because he did not meet the service and return requirements, plaintiff argues that the express "general appearance" exception has been satisfied. The facts are otherwise. By letter dated August 10, 1982, counsel for California Bell Operations confirmed an agreement with plaintiff that her client "shall have to and including August 30, 1982 to plead or otherwise respond to the first amended complaint . . . ." True, "[a] written stipulation between attorneys recognizing jurisdiction of the court over the parties constitutes a general appearance by the defendant." (*General Ins. Co. v. Superior Court,* (1975) 15 Cal.3d 449, 453 [124 Cal.Rptr. 745, 541 P.2d 289], original italics deleted.) But a party, like California Bell Operations, "who merely seeks an extension of time to plead cannot reasonably be deemed to make a general appearance. His purpose may be to obtain adequate time to determine whether or not to object to the jurisdiction of the court." (*Busching v. Superior Court* (1974) 12 Cal.3d 44, 51 [115 Cal.Rptr. 241, 524 P.2d 369].)

In any event, dismissal was proper. By August 10, 1982, the three-year period that began with the filing of the complaint on July 17, 1979, had already run. Even if entering into the stipulation could be deemed to constitute a general appearance, dismissal was nevertheless mandatory: "a general appearance *after* the three years had run did not operate to deprive a defendant of his right to a dismissal . . . ." (*Id.* at p. 52, italics in original.)

For the foregoing reasons, the judgment is affirmed.[9]

Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

---

[8]Former section 581a was repealed in 1984. (Stats. 1984, ch. 1705, § 3.) The substance of subdivision (a) is continued, with changes not material here, in current sections 583.210, 583.220, 583.230, 583.240, 583.250.

[9]We decline the request of City of Bell to judicially notice the minutes of certain meetings of the city council on the ground that they are not relevant to the issues before us. We also decline the city's request to impose sanctions on plaintiff pursuant to Code of Civil Procedure section 907: the city does not succeed in showing, nor does it appear to us, "that the appeal was frivolous or taken solely for delay . . . ." (Code Civ. Proc., § 907.)

LUCAS, J.—I concur in the judgment for the reasons stated in parts III and IV of the majority opinion. However, I believe that the majority opinion's analysis of the *Noerr-Pennington* doctrine's application is unnecessary to the result and therefore neither join in nor dissent to my colleagues' premature discussion.[1]

The majority opinion begins by stating "We *must* decide whether efforts to influence municipal action that are intended to and actually do produce anticompetitive effects are violative of the Cartwright Act when both private individuals and public officials participate." (*Ante,* at p. 316, italics added.) However, in my opinion there was no such necessity: even if it had been determined that plaintiff could have stated a Cartwright cause of action it would have been of no avail because the action had been properly dismissed.

I agree that application of the *Noerr-Pennington* doctrine in the context presented here is an interesting question. Nonetheless, I conclude that its resolution was not required and has no effect on the outcome of this case because dismissal was simultaneously and properly granted pursuant to the application of settled principles of law.

Bird, C. J., concurred.

---

[1]This view of course also extends to the other contentions more summarily dealt with in section II, subdivisions A, C, D, E, and F of the majority opinion. My focus on *Noerr-Pennington* treatment is due to its primacy in the opinion and its novelty.